## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

**ADRIAN E. PARKER, individually and on behalf of all others similarly situated**

**Plaintiff,**

**v.**

**NUTRISYSTEM, INC.,**

**Defendant.**

**CIVIL ACTION NO. 2:08-CV-01508**

**ELECTRONICALLY FILED**

## DEFENDANT NUTRISYSTEM, INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. STATEMENT OF UNDISPUTED FACTS ................................................. 3

    A.  NutriSystem's Business ........................................................................ 3

    B.  NutriSystem's Sales Associates ......................................................... 4

    C.  NutriSystem's Commission Plan ........................................................ 6

    D.  Plaintiffs And Their Employment With NutriSystem ......................... 8

    E.  Relevant Procedural History .............................................................. 10

III. LEGAL ARGUMENT ..................................................................................... 11

    A.  Summary Judgment Standard ............................................................. 11

    B.  Plaintiffs' Overtime And Minimum Wage Claim Fails Because They Were Exempt Under The Retail Commission Exemption ................................... 12

        1.  Plaintiffs Are Exempt Employees Under The FLSA's Retail Commission Exemption .......................................................... 12

        2.  NutriSystem's Call Center Is A "Retail Or Service Establishment" ....... 12

        3.  NutriSystem Paid Plaintiffs A Regular Rate Of At Least One And One-Half Times The Applicable Minimum Wage For All Hours They Worked During The Relevant Time Period .................................... 14

        4.  NutriSystem Paid Plaintiffs Pursuant To A Bona Fide Commission System ................................................................ 14

            a.  The Essence Of A Commission System Is That The Rate Of Pay Fluctuates With The Value Of The Service Performed And That Compensation Is Not Contingent Upon Hours Worked ................................ 14

            b.  Commissions Cannot Be Reduced To A Strict Percentage Of The Price Paid By The Customer ................................. 17

            c.  To The Extent Some Proportionality Is Required, There Is A Clear Relationship Between The Price Paid By The Customer And The Commission Received Under NutriSystem's Commission Plan ................................. 21

            d.  Plaintiffs' Theory That NutriSystem's Commission Plan Is A Piece-Rate System Is Wrong And Would Necessitate Significant Changes In The Compensation Plans Of The Retail Services Industry ................................. 23

IV. CONCLUSION .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

## CASES

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)................................................................................................11

English v. Ecolab, Inc.,
No. 06 Civ. 5672, 2008 WL 878456 (S.D.N.Y. Mar. 31, 2008) .............................13

Erichs v. Venator Group, Inc.,
128 F.Supp.2d 1255 (N.D. Cal. 2001) ...............................................................15, 20

Gieg v. DDR, Inc.,
407 F.3d 1038 (9th Cir. 2005) ...............................................................................12

Herman v. Suwannee Swifty Stores, Inc.,
19 F.Supp.2d 1365 (M.D. Ga. 1998) ......................................................................15

Huntley v. Bonner's, Inc.,
No. C02-1004L, 2003 WL 24133000 (W.D. Wa. Aug. 14, 2003) .........................19

Icicle Seafoods, Inc. v. Worthington,
475 U.S. 709 (1986)................................................................................................11

Ingram v. County of Bucks,
144 F.3d 265 (3d Cir. 1998)....................................................................................11

Klinedinst v. Swift Invs., Inc.,
260 F.3d 1251 (11th Cir. 2001) ..................................................................2, 12, 17

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986)................................................................................................11

Mechmet v. Four Seasons Hotels, Ltd.,
825 F .2d 1173 (7th Cir.1987) .........................................................................21, 25

Pontius v. Delta Fin. Corp.,
2007 WL 1496692 (W.D. Pa. Mar. 20, 2007) ........................................................17

Schwind v. EW & Assoc., Inc.,
371 F.Supp.2d 560 (S.D.N.Y. 2005)......................................................................12

Wilks v. Pep Boys,
No. 3:02-0837, 2006 WL 2821700 (M.D. Ten. Sep. 26, 2006)........................18, 19

## TABLE OF CONTENTS
(continued)

**Page**

Wilks v. Pep Boys,
    278 F. App'x 488, 489 (6th Cir. 2008)................................................................16, 18

Yi v. Sterling Collision Ctrs., Inc.,
    480 F.3d 505 (7th Cir. 2007) .......................................................2, 12, 16, 17, 24

## STATUTES

29 C.F.R. § 779.318(a)......................................................................................13

29 C.F.R. § 779.411 (2007) ...............................................................................12

29 C.F.R. § 779.412 ...............................................................................12, 15, 22

29 C.F.R. § 779.413(b) ........................................................................................2

29 C.F.R. § 779.416(c)....................................................................................2, 15

29 U.S.C. § 201 et seq.........................................................................................1

29 U.S.C. § 207(g) ............................................................................................23

29 U.S.C. § 207(i) .........................................................................................1, 12

29 U.S.C. § 207(i)(1) .........................................................................................14

Fed. R. Civ. P. 56(c) ..........................................................................................11

## MISCELLANEOUS

1998 DOLWH LEXIS 84 (October 29, 1998)...................................................14

1999 DOLWH LEXIS 125 (Dec. 16, 1999) .....................................................14

2006 DOLWH LEXIS 28 (June 29, 2006) ...................................................2, 17

I.    <u>**INTRODUCTION**</u>

This is a simple case to be decided as a matter of law, and in NutriSystem's favor.  By way of background, after NutriSystem terminated Plaintiff Adrian E. Parker's ("Plaintiff" or "Parker") employment for fraud, he brought the instant action under the Fair Labor and Standards Act, 29 U.S.C. § 201 <u>et</u> <u>seq.</u> ("FLSA" or "Act").  Although he never complained about overtime compensation during his employment, Parker now contends that he, and those similarly situated to him, were entitled to overtime compensation for all hours worked over 40 in a given workweek.[1]  Plaintiff's allegations not only reflect his personal bias, but his interpretation of the FLSA would lead to perverse and illogical compensation schemes.

NutriSystem has a generous commissioned-based compensation system that obviates the need for overtime, and most importantly, complies with the FLSA and the "retail commission exemption" of Section 7(i) of the Act.   NutriSystem has met all aspects of the retail commission exemption.  There are three key components of the exemption, all of which are met here. Plaintiff (1) worked in a retail or service establishment; (2) received a regular rate of at least one and one-half times the minimum wage; and (3) received at least half of his compensation pursuant to a bona fide commission plan.  <u>Id.</u> § 207(i).

Plaintiff does not seriously dispute the first two requirements of 7(i).  Instead, the merits of his claim can be resolved by answering one basic question:  Whether NutriSystem compensated Plaintiff and those who opted-in to this action pursuant to a bona fide commission plan.[2]  NutriSystem submits that the undisputed evidence demonstrates that the answer is "yes"

---

[1]  Only 15% of the total class decided to opt-in to this action, and only 14 of the opt-ins are current employees.

[2]  Plaintiffs' Counsel has repeatedly acknowledged that this is the pivotal issue in this matter.  (<u>See</u>, <u>e.g.</u>, 11/17/08 E-mail from S. Carson to S. Bouchard, at Ex. 1 ("This case focuses on the narrow issue of whether NutriSystem pays a bona fide commission (as recognized under the FLSA) or whether NutriSystem utilizes a flat-rate / piecework compensation plan.  Therefore, we think that discovery should properly focus on this issue."); 1/20/09 E-mail from S. Carson to S. Bouchard, at Ex. 2 ("This case boils down to two issues:  1) is the "commission" in this case a bona

and, accordingly, moves for summary judgment on the claims of Adrian Parker, as well as opt-in

Plaintiffs Donald J. Wilson, Frank L. Stephens, IV, Monica Thompson, and Senya Saunders

(collectively, "Plaintiffs").[3]

       According to Plaintiffs, however, NutriSystem's generous compensation plan does not

qualify as a bona fide commission plan under Section 7(i) because it does not strictly correlate

the commissions earned with the revenue generated per sale.  This position, however, is simply

incorrect.  Although no controlling authority exists on the issue, the weight of authority makes

clear that an incentive-based method of compensation tied to productivity and the value of goods

or services provided to customers constitutes a 7(i) commission.  See Yi v. Sterling Collision

Ctrs., Inc., 480 F.3d 505 (7th Cir. 2007); Klinedinst v. Swift Invs., Inc.,  260 F.3d 1251 (11th

Cir. 2001); 29 C.F.R. § 779.413(b), 29 C.F.R. § 779.416(c); 2006 DOLWH LEXIS 28, at *2-3

(June 29, 2006) (Barbara R. Relerford, Fair Labor Standards Team, Office of Enforcement

Policy);1988 DOLWH LEXIS 84 (May 24, 1988) (Paula V. Smith, Administrator).  This is

because 7(i) does not require a commission to have a percentage relationship to the sales

revenue, but rather the commission needs to be connected to the value of the service provided by

the sales associate and the compensation needs to be decoupled from the hours worked.

       The contrary interpretation advocated by Plaintiffs defies common sense.  Under

Plaintiffs' requirement of strict proportionality, retail establishments utilizing a percentage-based

commission plan would be precluded from compensating more senior sales associates at a higher

---

fide commission for purposes of the FLSA; and 2) the number of hours worked by the collective action members. Therefore, discovery should focus on these two issues.  Discovery regarding the first issue is solely in your client's possession.") (emphasis added).  After Plaintiffs' counsel wrote these emails, and in response to formal document requests, NutriSystem produced to Plaintiffs all documents relevant to the instant motion.  As a result, no need to take Rule 56(f) discovery exists.

[3]  At this stage, NutriSystem is only moving for summary judgment as to these five Plaintiffs and not the entire opt-in class of sixty-eight Plaintiffs.  Parker is the Named Plaintiff who initiated this lawsuit, and the other four Plaintiffs subject to this instant Motion were the first four Class Members to opt-into this litigation.  NutriSystem anticipates filing subsequent summary judgment motions for the remaining Class Members after the Court rules on this Motion.

percentage of a sale than a junior employee.  Retail establishments would be precluded from offering higher commissions for more difficult sales.  Employees would lack incentive to inform customers of eligibility for discounts or direct them to sale items because the reduced price in product would necessitate a lower commission.  No evidence exists that Congress intended for such an interpretation of 7(i) when it enacted the exemption.

As the weight of legal authority and the practical application of commission plans support NutriSystem's interpretation of 7(i), the Court should grant it summary judgment on Plaintiffs' claims and hold the Company's commission plan to be bona fide.[4]

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     NutriSystem's Business

NutriSystem is a retail establishment operating a call center in Horsham, Pennsylvania and a leading provider of a weight management system based on portion-controlled, prepared meal programs.  (NutriSystem Form 10-K, 2/29/2008, at p. 3, at Ex. 3).  NutriSystem markets and sells its weight management programs to individual customers and families for their personal use.  (Id.).  NutriSystem sells almost all of its products through customers placing orders via the Internet or the telephone.  NutriSystem also has an agreement with QVC, the home shopping television network, to sell its products, but these sales amount to no more than 5% of its annual revenues during the relevant time period.  (Id., at p. 7).  From 2005 to the present, NutriSystem has generated significantly more than 75% of its annual revenues from retail transactions where it directly sells its products to customers.  (See id., at pp. 27-28) ("In the years ended 2007, 2006 and 2005, the direct channel represented 94%, 93% and 90%, respectively, of our revenue.").

---

[4] The Court should also dismiss Plaintiffs' individual state-law claims (Count II) under the Pennsylvania Minimum Wage Act ("PMWA").  As set forth in detail at pp. 11-12 of NutriSystem's Brief in Support of Its Motion to Dismiss Plaintiff's State-Law Class Claims (granted by the Court), PMWA's exemptions substantially incorporate those set forth in the FLSA.  (See Docket No. 22, filed June 11, 2008).  Accordingly, as Plaintiffs are exempt under the FLSA, they are exempt under the PMWA and their state-law claim must fail.

3

### B.     NutriSystem's Sales Associates

NutriSystem relies upon its Sales Associates located in its Horsham call center to sell its programs to current and potential customers.  Sales Associates make sales either by receiving incoming telephone calls from potential customers dialing the Company's 1-800 number or by initiating out-bound sales calls to leads and targeted potential customers.  (See NutriSystem Sales Representative Job Description at Monster.com, at Ex. 4).

NutriSystem is a twenty-four hour operation and assigns Sales Associates to eight and one-half hour shifts, including an 11:00 p.m. to 7:30 a.m. shift (the "overnight shift").  (See, e.g., Deposition of Adrian E. Parker ("Parker Dep."), at pp. 122-23, at Ex. 5).  Different shifts and days worked are more or less desirable from a commission-earning perspective.  For example, it is more difficult for Sales Associates to make sales on the overnight shift because there are fewer incoming calls and they are precluded from making outgoing sales calls based on the late hour. Accordingly, absent a proper incentive structure NutriSystem would have difficulty staffing the overnight shift or the weekend shift, which also suffers from a dearth of incoming calls. Similarly, Sales Associates tend to have more sales opportunities in the beginning of a new year due to customers' "holiday remorse," than in November and December when customers are more focused on holiday events than weight loss.  (See, e.g., NutriSystem Form 10-K at Ex. 3, 2/29/2008, at p. 9; Parker Dep. 169 at Ex. 5).

Although NutriSystem does not have a policy requiring or encouraging excess hours, eligible Sales Associates are permitted to work in excess of forty hours per week.  Prior to January 2007, upon approval, Sales Associates on all shifts could work as many hours beyond their shift as they desired.  (See Sales Introductory Training Program ("Sales Manual"), "Sales Policies," at Ex.6; 1/12/07 E-mail from R. Smedley to Sales Supervisors, at Ex. 7).  The supervisor would approve requests for additional hours based on the volume of incoming phone

calls and the Sales Associate's performance.  After January 2007, Sales Associates on most shifts (the exception being the overnight shift) could only work additional hours if they exceeded the Sales Department's average for Sales Dollars Per Call ("SDPC") for the preceding week.  (Id.).  NutriSystem instituted this policy to encourage efficiency at work.

NutriSystem's commission system is a generous one, and rewards the majority of Sales Associates based on performance, rather than hours worked.  NutriSystem pays its Sales Associates the greater of their regular and overtime hourly earnings for a bi-weekly pay period or the total value of the eligible commissions in a bi-weekly pay period.  (See 5/20/08 Memorandum from Scott Falconer, at Ex. 8; 3/18/05 Sales Memorandum from Tom Connerty, at Ex. 9).  This means, at a minimum, Sales Associates earn $10.00 an hour plus $15.00 an hour for all hours worked over forty hours in a given workweek.  However, Sales Associates also are eligible to receive commissions for their sale of NutriSystem products.  At the end of the pay period, NutriSystem calculates whether a Sales Associate would receive higher pay based on:  1) their hourly rate (factoring in any premium rate for hours over 40); or 2) their eligible commissions.[5]  If the Sales Associate's commissions exceed his hourly rate, the Sales Associate is paid on a commission basis.  If the Sales Associate's hourly earnings exceed his commissions, then he is paid an hourly rate.  (Id.).

The majority of Sales Associates are compensated by commission.  For example, of the five Plaintiffs subject to this motion, only two ever were paid on an hourly basis, and even those two only were paid hourly for a total of five pay periods.  (See Ex. A to the Declaration of

---

[5]  For example, assume that a Sales Associate works 45 hours the first week of the pay period and 42 hours the second weeks.  The Sales Associate's total hourly earnings for the pay period would be $905 (80 hours x $10.00 plus 7 hours x $15.00 = $905).  During the same pay period, the Sales Associate completes sufficient sales to be eligible to receive $1,035 in commissions.  In this example, NutriSystem would pay the Sales Associate $1,035 because the eligible commissions exceeded the hourly rate.  However, if the Sales Associate made fewer sales and was only eligible to receive less than $905 in commissions, NutriSystem would pay the Sales Associate $905 based on the hourly earnings.  (See, e.g., 3/18/05 Connerty Memorandum at Exhibit 9).

Jonathan S. Krause, Esq., at Ex. 10; <u>see also</u> Decl. of Denise Bergner, at Ex. 11).  NutriSystem pays Sales Associates the commissions when the order is shipped, regardless of whether the customer subsequently returns the product and receives a refund.

Although NutriSystem primarily compensates its Sales Associates via commission, it also has in place an incentive program to reward Sales Associates who perform well according to a series of metrics.  These metrics include recognizing leaders in:  1) SDPC; 2) total revenue generated; 3) sales from outgoing calls to leads; and 4) priority processing orders.  (<u>See</u>, <u>e.g.</u>, Parker Dep. 181-186).  In addition to cash bonus payments, NutriSystem also rewards recipients with prizes in the forms of gift cards, electronic merchandise, computers, and vacations.  (<u>Id.</u>).  However, these incentive bonus payments constitute a miniscule amount of Sales Associates' total compensation, with no Class Member receiving more than $9,000 in incentive payments during the Class Period.  (<u>See</u> Sales Associate Bonus List/Incentive Earnings, at Ex. 12).

### C.    NutriSystem's Commission Plan

In March 2005, NutriSystem unveiled its current commission system to compensate its Sales Associates based on their sales, rather than their hours worked.  (March 18, 2005 Sales Memorandum from Tom Connerty, at Ex. 9).  Under this commission plan, the Company pays Sales Associates $18 for 28-day program sales made on incoming calls during daytime hours, $25 for each 28-day program sale made on incoming calls during evening and weekend hours, and $40 for each 28-day program sale made on outbound calls.  (<u>Id.</u>).  <u>The 28-Day Program</u> has been in effect since the creation of the current commission system and constitutes NutriSystem's core program.[6]  (<u>See</u> 2/29/08 Form 10-K, p. 6; Parker Dep. 153).  NutriSystem offers different

---

[6] Although NutriSystem's 28-day program is its signature program, constituting a majority of all sales made by Sales Associates, NutriSystem has also developed additional commission programs in effect during Plaintiffs' employment, including: 1) <u>priority processing</u> (where customers pay an extra $19.95 for their order to be moved to the head of the shipping line, thus guaranteeing quicker delivery and Sales

28-day orders depending upon the customers' needs, which vary in price.  For example, in 2008, NutriSystem offered: (a) women's 28-Day auto-ship[7] for a base cost of $293.72; (b) women and men's silver (for more elderly customers) 28-Day auto-ship for a base cost of $293.72; (c) women and men's diabetic-friendly 28-Day auto-ship for a base cost of $293.72; (d) women and men's vegetarian 28-Day auto-ship for a base cost of $293.72; (e) the same programs identified in "a" through "d," only not sent through auto-ship, at a base cost of $342.36; (f) men's 28-Day auto-ship for a base cost of $319.95; and (g) men's 28-Day non-auto-ship for a base cost of $371.50.  (See Program List, at Ex.13).

While NutriSystem sets base prices for its 28-day programs, it also offers a variety of discounts and promotions throughout the year to encourage customers' purchases.  For example, NutriSystem might ship coupons to targeted customers offering $50 off an order for a limited time, discount $50 per order when multiple family members order simultaneously, or discount an order $30 if the customer refers another customer to NutriSystem.  See, e.g., Parker Dep. 136-139.  In addition, NutriSystem will change its prices to respond to market conditions, and the overall price paid by the customer will be affected by state-by-state tax requirements.

Rather than penalize Sales Associates by reducing their commission when the customer is eligible for certain discounts, NutriSystem pays its Sales Associates three flat commissions based on the time and method the order is placed.  In addition to not penalizing Sales Associates for selling to customers eligible for discounts, the flat commissions also encourage Sales Associates

---

Associates receive $1.00 in commission);  2) bad fund/denied credit card (where Sales Associates receive $18 or $25 commissions for convincing customers who provided cancelled or invalid credit card information to continue their relationship with NutriSystem); and 3) zero water (where Sales Associates receive $5 or $15 for selling nutritional water products).  These additional programs did not exist for most of the Class Period.  (See Sales Manual, p. 21; Parker Dep. 142-151, 153).

[7]  "Auto-ship" is when the customer signs up to receive automatic monthly shipments of the product, and is charged by NutriSystem on a monthly basis.  However, the customer is under no obligation to continue to purchase NutriSystem products after the initial month (and, indeed, can return for a full refund the initial month's purchase). (See Sales Manual, p. 20).

to recommend the weight-management program most appropriate for the customer (for example, a "silver" package compared to a regular package), rather than being influenced by differences in program price.  The commission payments are as follows:

- $18 for orders placed from inbound calls during daytime hours on weeknights;
- $25 for orders placed from inbound calls during evening hours on weeknights and weekends; and, as of the fourth quarter of 2006,
- $40 for orders placed from outbound calls or during the overnight shift.[8]

### D.   **Plaintiffs And Their Employment With NutriSystem**

**Adrian E. Parker** filed the Complaint on behalf of himself and similarly-situated former and current Sales Associates on March 28, 2008.  (See Docket No. 1).  NutriSystem employed Parker from November 2005 until February 2008,[9] when he was terminated for falsifying Company records.  (See Employee Action Notice, at Ex. 14).  NutriSystem always paid Parker pursuant to his commissions, as opposed to his hours worked because he always earned more in commissions than the hourly rate plus premium pay.  See Pl. Dep. 111:3-8. Plaintiff earned anywhere from $68,000 to $75,000 per year, approximately three times more than he earned at his last regular job.  (Pl. Dep. 52:16-18, 176:22-177:1, 254:7-20; Parker 2007 W-2, at Ex.15; Krause Decl., Ex. B).  According to NutriSystem's records, the most hours Parker ever worked per year was 2080.25 in 2006, which, on average, is about 40 hours per week. (Krause Decl., Ex. A).

**Donald J. Wilson** filed his consent to join this case as a plaintiff on June 3, 2008 and January 12, 2009.  NutriSystem employed Wilson from December 2005 until November

---

[8] When NutriSystem created the overnight shift, it set the commission rate at $40 in recognition of the reduced volume of orders possible during these late hours and to motivate Sales Associates to be willing to work that shift.

[9] NutriSystem denies that the three year limitations period for willful violation of the FLSA applies.  However, for purposes of this motion, it presents evidence to establish the exemption for the maximum period of potential liability.

2007, when he was terminated for misconduct.  (See Employee Action Notice, at Ex.16).

NutriSystem always paid Wilson pursuant to his commissions, as opposed to his hours worked

because he earned more in commissions than the hourly rate plus premium pay.  (Krause Decl.,

Ex. B).  Wilson earned as much as $80,769 per year while employed by NutriSystem.  (Id.).

According to NutriSystem's records, the most hours Wilson ever worked in a year were 2405.5

in 2006, which, on average, is approximately 48 hours per week.  (Id., Ex. A).

      **Frank L. Stephens, IV**, filed his consent to join this case as a plaintiff on June 3,

2008 and October 21, 2008.  NutriSystem employed Stephens from December 2005 until

September 2008, when he was terminated for performance deficiencies.  (See Employee Action

Notice, at Ex. 17).  Except for three pay periods when he was on vacation, NutriSystem always

paid Stephens pursuant to his commissions, as opposed to his hours worked because he earned

more in commissions than the hourly rate plus premium pay.  (Krause Decl., Ex. B). Stephens

earned as much as $84,393.50 per year while employed by NutriSystem.  (Id.).  According to

NutriSystem's records, the most hours Stephens ever worked in a year were 2196.5 in 2006,

which, on average, is approximately 44 hours per week  (Id., Ex. A).

      **Monica Thompson** filed her consent to join this case as a plaintiff on June 3,

2008.  NutriSystem employed Thompson from November 2005 until October 2008, when she

was terminated for performance deficiencies.  (See Employee Action Notice, at Ex.18).

NutriSystem always paid Thompson pursuant to her commissions.  (Krause Decl., Ex. B).

Thompson earned as much as $58,998 per year while employed by NutriSystem.  (Id.).

According to NutriSystem's records, the most hours Thompson ever worked in a year were

1970.25 in 2006, which, on average, is approximately 39 hours per week. (Id., Ex. A).

**Senya Saunders** filed her consent to join this case as a plaintiff on June 3, 2008.
NutriSystem employed Saunders from December 2005 until November 2007, when she was
terminated for job abandonment.  (See Employee Action Notice, at Ex. 19).  Except for two pay
periods where her hourly wages exceeded his commissions, NutriSystem always paid Saunders
pursuant to her commissions, as opposed to her hours worked because she earned more in
commissions than the hourly rate plus premium pay.  (Krause Decl., Ex. B).  Saunders earned as
much as $45,865.50 per year while employed by NutriSystem.  (Id.).  According to
NutriSystem's records, the most hours Saunders ever worked in a year were 1774 in 2006,
which, on average, is approximately thirty-five hours per week.  (Id., Ex. A).

### E.    Relevant Procedural History

On March 28, 2008, Plaintiff filed a Complaint purportedly on behalf of current and
former Sales Associates, alleging that NutriSystem violated the FLSA by failing to pay overtime
compensation.  (See Comp. ¶¶ 1, 43-48, See Docket No. 1). In the Complaint, Plaintiff
repeatedly alleged NutriSystem compensated him pursuant to a commission plan and that being
paid commissions violated the FLSA.  See id. ¶¶ 19-33 (emphasis added).

On April 23, 2008, counsel for the Parties conducted the Rule 26 Conference.  Prior to
the Rule 26 Conference, Plaintiff's counsel e-mailed NutriSystem a proposed Notice Form and
requested that NutriSystem consent to conditional certification and the proposed Notice.  (See
April 21, 2008 E-mail, at Ex. 20).  Consistent with the allegations in the Complaint, the proposed
Notice described the lawsuit as follows:

> This lawsuit alleges that Sales Associates…failed to receive overtime
> compensation…and that Defendant did not include the commissions earned by
> Sales Associates for the purpose of calculating overtime pursuant to the FLSA.
> The lawsuit alleges that Defendant failed to take commissions into account in
> calculating a "regular rate" of pay…

Plaintiff's Proposed Notice, p. 1, at Ex. 21 (emphasis added).

On May 28, 2008, Plaintiff filed an Amended Complaint that radically recast his description of NutriSystem's compensation plan and added a state-law class claim under the Pennsylvania Minimum Wage Act.  (See Docket No. 3).  Plaintiff revised his description of NutriSystem's compensation system from commissions to "piece-work."  See Am. Compl., (See Docket No. 3).  ¶38; compare with Compl. ¶¶ 29-33.  Plaintiff did not raise new allegations regarding how he was compensated, but only altered his previous characterization of the payments to circumvent 7(i)'s requirements and avoid dismissal.

On July 25, 2008, the Court dismissed Plaintiffs' state-law class-claims.  On September 26, 2008, the Court conditionally certified this action proceed as a collective action and ordered notice be issued to prospective class members.  Of the 440 potential Class Members who received notice, only 68 opted to become Plaintiffs in this litigation.  Of those 68 Plaintiffs, only 14 are current employees of NutriSystem.

## III.   LEGAL ARGUMENT

### A.   Summary Judgment Standard

Summary judgment should be granted where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  If the evidence "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and the motion should be granted.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The ultimate decision of whether the duties and activities of an employee qualify as exempt work under the FLSA is a question of law for the Court.  See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986) (observing that whether particular activities excluded plaintiffs from "overtime benefits of the FLSA is a question of law"); Ingram v. County of

Bucks, 144 F.3d 265 (3d Cir. 1998) ("[T]he determination of whether a plaintiff's activities exclude him 'from the overtime benefits of the FLSA is a question of law,' which can properly be resolved on summary judgment.").   A defendant does not bear any heightened burden of proof in establishing the applicability of an exemption; a defendant need only prove the exemption applies by a preponderance of the evidence.  Yi v. Sterling Collision Ctrs., Inc., 480 F.3d 505, 507 (7th Cir. 2007).  Even viewing all of the facts in the light most favorable to the Plaintiffs, there is no genuine dispute as to whether they are exempt.

### B.   Plaintiffs' Overtime And Minimum Wage Claim Fails Because They Were Exempt Under The Retail Commission Exemption

#### 1.   Plaintiffs Are Exempt Employees Under The FLSA's Retail Commission Exemption.

Plaintiffs qualify for exemption under Section 7(i) of the FLSA.  29 U.S.C. § 207(i).[10] The 7(i) exemption is not based on the duties of the employee but based on the method of compensation.  Gieg v. DDR, Inc., 407 F.3d 1038, 1046 (9th Cir. 2005) ("[T]he policy justification for the exemption thus appears to have more to do with the employee's compensation than with the exact nature of the good or services sold.").  All of the elements of 7(i) are met here.

#### 2.   NutriSystem's Call Center Is A "Retail Or Service Establishment"

Plaintiffs cannot dispute that NutriSystem qualifies as a "retail or service establishment" under DOL regulations and federal caselaw.  A "retail or service establishment" is:  (1) an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and (2) recognized as retail sales or services in the particular industry.  See,

---

[10]  Section 7(i) also known as the "retail commission exemption," requires that Plaintiffs:  1) worked in a retail or service establishment; 2) received a regular rate of at minimum one and one-half times the minimum wage; and 3) received at least half their compensation pursuant to a bona fide commission plan.  Id.; see also Klinedist v. Swift Invs., Inc., 260 F.3d 1251, 1254 (11th Cir. 2001); Yi, 480 F.3d at 508; 29 C.F.R. § 779.412.

e.g., Schwind v. EW & Assoc., Inc., 371 F.Supp.2d 560, 564 (S.D.N.Y. 2005); 29 C.F.R. §

779.411 (2007).  As the DOL regulations further explained:

> Typically a retail or service establishment is one which sells goods or services to
> the general public.  It serves the everyday needs of the community in which it is
> located.  The retail or service establishment performs a function in the business
> organization of the Nation which is at the very end of the stream of distribution,
> disposing in small quantities of the products and skills of such organization and
> does not take part in the manufacturing process.

29 C.F.R. § 779.318(a); see also English v. Ecolab, Inc. No. 06 Civ. 5672, 2008 WL 878456, at

*8 (S.D.N.Y. Mar. 31, 2008).  NutriSystem clearly satisfies these requirements.

First, NutriSystem generates revenue by selling weight management programs to

individuals or families, easily satisfying the 75% requirement.  As NutriSystem explains in its

Form 10-K, "[w]e sell our weight management program through a direct-to-consumer sales and

distribution approach using the Internet and telephone."  (See Form 10-K, p. 3).  As Parker

explained, NutriSystem sells its weight loss programs to "[p]eople on the other end of the

phone…, groups of people sometimes."  (Parker Dep. 55).  NutriSystem is "at the very end of

the stream of distribution" and does not sell its products to customers with the intent that those

customers will in turn resell the product.[11]  More basically, NutriSystem's business is selling

weight-management products to individual customers seeking to lose weight or maintain their

current weight.  This is not a wholesale operation, but rather a business that targets individual

customers.  As it does not sell products for resale, NutriSystem meets the first requirement.

Second, NutriSystem is recognized as providing a retail service.  The DOL regulations –

although not exhaustive – specifically include grocery stores, restaurants, and other

establishments that sell food or drink to the general public.  See 29 C.F.R. § 779.318(a).  In an

---

[11]  NutriSystem also sells a limited amount of its products through QVC, the television shopping network.  (See,
e.g., Form 10-K, p. 7).  However, NutriSystem generates no more than 10% of its revenue through the QVC-based
sales during the Class Period, so this does not affect their qualification as a retail service establishment.  Id., 27-28.

Opinion Letter, the DOL's Office of Enforcement Policy concluded that a company which sold groceries and other consumer items to customers who placed orders via the telephone and Internet (as with NutriSystem's customers) qualified as a retail establishment for purposes of 7(i).  See Dep't of Labor Op. Ltr., 1999 DOLWH LEXIS 125 (Dec. 16, 1999).  Therefore, NutriSystem is a retail establishment for purposes of 7(i).

### 3.  NutriSystem Paid Plaintiffs A Regular Rate Of At Least One And One-Half Times The Applicable Minimum Wage For All Hours They Worked During The Relevant Time Period.

NutriSystem paid all five Plaintiffs more than 1.5 times the minimum wage for every hour they worked in all workweeks that it treated them as exempt under Section 7(i).[12]  29 U.S.C. § 207(i)(1); see Exhs. A&B to Krause Decl.  Furthermore, for the five total pay periods for which Stephens and Saunders were paid on an hourly basis, and not pursuant to their commission plan, NutriSystem does not seek to apply 7(i), thus making their hourly rate for these periods irrelevant.[13]  See 1998 DOLWH LEXIS 84 (October 29, 1998) (flat rate compensation system valid under Section 7(i) when employer did not take the exemption in weeks in which employee's compensation fell below 1.5 times minimum wage).  Thus, the second criterion for the retail commission exemption is satisfied with regard to Plaintiffs.

### 4.  NutriSystem Paid Plaintiffs Pursuant To A Bona Fide Commission System

#### a.  The Essence Of A Commission System Is That The Rate Of Pay Fluctuates With The Value Of The Service Performed And That Compensation Is Not Contingent Upon Hours Worked.

NutriSystem satisfies the final element of the retail commission exemption because each

---

[12]  Until July 24, 2007, the federal minimum wage was $5.15; from July 24, 2007 to July 24, 2008 it was $5.85, and from July 24, 2008 through the present it is $6.55.

[13]  Parker, Wilson, and Thompson never were paid on an hourly basis because their commission payments always exceeded their hourly wage in each pay period.  Stephens was only paid on an hourly basis for three pay periods

Plaintiff received more than one-half of his total compensation in the form of commissions from the sale of services over a representative period of not less than one month[14] during the entire relevant period.  29 C.F.R. § 779.412.  Plaintiffs unnecessarily tie commissions with a strict percentage of the sales price.  (See Am. Compl. ¶ 39; see also Parker Dep. 62 ("[I]n my mind, commission is a percentage based on a sale that you make to a client or to a customer, based on the retail value of what you sold.").  However, based on caselaw, regulations, and the policy rationale for the FLSA's overtime requirement, NutriSystem's commission plan is bona fide.

        A commission payment does not have to be a percentage of the price paid by the customer to be bona fide.  Applicable DOL regulations explicitly state that commissions are tied with the value created by the employee, which is not strictly measured through the sales price percentage.  Specifically, although the DOL regulations do not define the term "commission," they state that a commission system is not "bona fide" if "the formula for computing the commissions is such that the employee, in fact, always or almost always earns the same fixed amount of compensation for each workweek."  29 C.F.R. § 779.416(c).  Thus, for example, a system would not be bona fide if:

> the employee receives a regular payment constituting nearly his entire earnings
> which is expressed in terms of a percentage of the sales which the establishment
> or department can always be expected to make with only a slight addition to his
> wages based upon a greatly reduced percentage applied to the sales above the
> expected quota.

---

when he was on vacation (December 18, 2005; December 3, 2006; and December 7, 2007), and Saunders was only paid on an hourly basis twice (December 17, 2006; October 21, 2007).  (See Ex. B to Krause Decl.).

[14]  As Stephens and Saunders were the only Plaintiffs ever paid on an hourly basis and this only happened over five pay periods, there is no issue as to whether the commission payments constituted one-half or more of Plaintiffs' total compensation over a representative period.  Moreover, that NutriSystem provided a floor for earnings for the rare circumstances that a Sales Associates' commissions did not exceed the minimum wage plus time and one-half payments for all hours worked over forty does not invalidate its commission plan.  As one court explained, "[t]he presence of downside protection, of course, is not synonymous with a sham commission plan.  As already discussed, the regulations express comfort with the co-existence of a bona fide commission rate plan and downside protection."  Erichs v. Venator Group, Inc., 128 F.Supp.2d 1255, 1260 n.4 (N.D. Cal. 2001).

Id.; see also Herman v. Suwannee Swifty Stores, Inc., 19 F.Supp.2d 1365, 1369 (M.D. Ga. 1998) (relying upon 29 C.F.R. § 779.416(c) to determine what constitutes a "bona fide" commission in denying employer's motion for summary judgment on basis that commission plan was not bona fide where employees almost always earned the same amount below the guaranteed draw).[15]

These definitions illuminate the essential nature of a Section 7(i) commission – it must fluctuate from period to period and not strictly depend upon the number of hours worked, based upon factors such as the skill and efficiency of the individual and the level of activity within the establishment.  See, e.g., Yi, 480 F.3d at 509 ("The faster the team works, the more it earns per number of hours . . . .  That is how commissions work; they are decoupled from actual time worked.") (emphasis added).  Once so understood, it is clear that it is not necessary for the "commission" to be tied directly to the price charged to a particular consumer.  Instead, any method of compensation in a retail establishment that is tied to productivity and the value of goods or services provided to customers should be considered a 7(i) commission.

It is indisputable that NutriSystem's commission system is tied to productivity and the value of services performed by each employee.  Plaintiffs earned commissions whose amount reflected the value NutriSystem placed on the type and difficulty of each kind of sale, the difficulty of each sale, and the Company's assessment of the necessary commission amount to incentivize its Sales Associates to work towards completing a particular kind of sale.  Therefore, 28-day orders are valued more highly than zero water sales by NutriSystem because they generate greater revenue and are the Company's signature program, and the higher commission amount reflects this valuation.  Similarly, amongst 28-day orders, NutriSystem assigns higher

---

[15]  Here, Plaintiffs cannot plausibly contend that the example provided in Section 779.416(c) of the regulations is applicable.  As demonstrated in the attached chart, Plaintiffs' wages per pay period fluctuated considerably such that NutriSystem's commission was not a sham designed to pay Sales Associates a fixed amount and avoid overtime obligations.   (See Ex. B to Krause Decl.).

commissions for outbound call and overnight/weekend calls than inbound, daytime calls to reflect the increased difficulty in generating those sales and/or staffing those shifts. Additionally, Plaintiffs did not need to work long hours to generate high commission payments: depending on his conversion rate, a Sales Associate could make more commissions in forty hours than another Sales Associate could make in sixty hours. Accordingly, NutriSystem's commission plan meets the requirements of 7(i).

### b. Commissions Cannot Be Reduced To A Strict Percentage Of The Price Paid By The Customer.

Flat-rate commission plans have met with approval by at least two Courts of Appeals, including Judge Posner of the Seventh Circuit Court of Appeals.[16]  See Yi, 480 F.3d at 505; Klinedinst, 260 F.3d at 1251; see also 2006 DOLWH LEXIS 28, at *2-3 (June 29, 2006) (Barbara R. Relerford, Fair Labor Standards Team, Office of Enforcement Policy);1988 DOLWH LEXIS 84 (May 24, 1988) (Paula V. Smith, Administrator).  In Yi, defendants paid plaintiffs auto mechanics as follows:

> [Defendant Sterling] calculates the number of hours normally required to do a given type of repair (these are called "booked hours") and multiplies that number by a dollar figure. The product of this multiplication is the labor price of the repair to the customer. Sterling adds material costs to the labor price to come up with a final price. A team of mechanics is then assigned to the job. Each member of the team keeps track of the hours he works on the job. When it's completed and the hours of the team members are added up, Sterling determines each member's compensation by multiplying (1) the number of booked hours for the job by (2) the ratio of the team member's actual hours worked to the total hours worked by the team, and then by (3) a wage, per booked (not actually worked) hour, based on the skill or quality of the individual team member.

---

[16]  NutriSystem is unaware of any opinion in the Third Circuit or its district courts, which address the relevant issues of 7(i)'s applicability.  In the only district court opinion in the Third Circuit that even addressed the issue of whether the retail sales exemption applied to the plaintiffs, the Court concluded that the plaintiffs were non-exempt because the regulations explicitly exclude finance enterprises from 7(i)'s ambit.  See Pontius v. Delta Fin. Corp., 2007 WL 1496692, at *5 (W.D. Pa. Mar. 20, 2007).  This holding, of course, has no relevance here.

Yi, 480 F.3d at 509.[17]  The monetary value of booked hours was not reduced based on the actual dollar amount paid by customers.  In holding that such a payment system qualified as a commission under 7(i), Judge Posner explained cogently why such commissions paid to mechanics are directly analogous to those paid to teams of real estate brokers:

> The only differences between our case and the brokerage example are, first, that there is an additional weighting, by quality, in our case, and, second, that the commission in the real estate example is on the full price of the good sold (the house), whereas in our case it is on only part of the price – the price of the labor that goes into the repair. There is also a materials cost, and the mechanics do not share in the part of the price that covers those costs.

> The first difference is irrelevant – but so is the second.  Suppose a seller pays shipping costs and adds them to his price to the buyer, but the seller pays his salesmen commissions based on the price minus those costs; it would still be a bona fide commission system of compensation.

Id.  As Judge Posner recognized, a strict correlation between commission and sales price is unnecessary and inconsistent with the rationale for a commission plan.

Plaintiffs may erroneously rely on two flawed opinions for the proposition that strict proportionality is required under 7(i).  In Wilks v. Pep Boys, the Sixth Circuit in an unpublished opinion casually affirmed the district court's holding that commissions must be proportionate to the amount charged to the customer.  278 F. App'x 488, 489 (6th Cir. 2008) (affirming Wilks v. Pep Boys, No. 3:02-0837, 2006 WL 2821700 (M.D. Ten. Sep. 26, 2006)).  Without discussing the merits of the district court's reasoning, the Sixth Circuit held that "the employer must establish some proportionality between the compensation to the employees and the amount charged to the customer."  Id.  In reaching its opinion, the district court relied solely on the fact that the consumer's price per labor hour did not always correlate exactly to the flat rate paid to each Flat-Rate Mechanic:

---

[17]  Defendants' commission system in Klinedist is virtually identical.  There, the Eleventh Circuit concluded that the flat-rate system constitutes a commission because it "is a method of providing employees with an incentive to 'hustle' to finish their jobs in order to obtain a larger number of jobs for greater compensation.  Id. at 1254-56.

> [T]he defendant has not met its burden of demonstrating proportionality between the plaintiffs' flat-rate wages and the charges passed on to customers, either for labor alone or for the overall task. If flat-rate compensation and labor costs were actually correlated, as the defendant claims they are, the labor costs would fluctuate based on the amount paid to the flat-rate employee tasked with completing the job. They do not. As such, it appears that the plaintiffs merely earn a predetermined amount for each task they complete and that this amount does not fluctuate in tandem with the amount charged to the customers.

Wilks, 2006 WL 2821700 at *18.[18]  Besides Wilks, there is no federal authority under the FLSA for this proposition. It defies logic to suggest that, in order to be a bona fide commission system under 7(i), the amount charged to customers must fluctuate precisely with the rate paid to the employee. If this Court were to adopt such a rule, it would prevent any retail establishment from rewarding employees with higher commission rates based upon skill or longevity with the Company. For example, under Plaintiffs'/Wilks' definition of commission, a clothing store could not pay a long-term employee with 25 years experience a 33% commission on all items sold and a new employee a 30% commission on all items sold without losing the exception provided by Section 7(i). It is nonsensical to suggest that a consumer should pay a different price based upon which sales person makes the sale.

Furthermore, if NutriSystem was legally obligated to maintain a constant sales to commission ratio to keep the 7(i) exemption, it would effectively be precluded from running a 24 hour operation because it could not set the commission amount above the amount provided for daytime sales. Similarly, NutriSystem would likely see a decrease in the amount of sales made from outbound calls because these sales are more difficult to close and, without a higher

---

[18] The second opinion requiring proportionality is easily distinguishable. In Huntley v. Bonner's, Inc., in holding that the defendants' employees were non-exempt, the district court relied upon a *Washington State* regulation pursuant to the Washington State Minimum Wage Act and then noted that the "last sentence [of the quoted Washington State regulation] expressly excludes flat rates that do not correlate to the charges imposed on the customer." Huntley v. Bonner's, Inc., No. C02-1004L, 2003 WL 24133000, at *4 (W.D. Wa. Aug. 14, 2003). This matter does not depend upon interpretation of a Washington state regulation, and, therefore, Huntley is of no consequence.

commission to reflect the increased difficulty, Sales Associates have no incentive to focus on these calls, as opposed to the easier inbound calls.

An illustrative example sets forth the problems with a strict proportionality requirement for a commission plan.  Consider the case of a sales associate at a large department store that decides to significantly reduce the price of some of its ties.  If commission is strictly correlated to sales price, a sales associate is disincentivized from steering potential customers to the discounted ties because, for comparable effort, he can direct customers to a full-price tie or other mens' wear products which would yield higher commissions.  Under Plaintiffs' theory, the sales associate has minimal incentive to encourage the purchase of the discounted tie – even though his employer wishes to move that product – because he would have to spend approximately the same amount of time convincing a customer to purchase the lower-commissioned item as he would for an item that brings him greater pecuniary advantage.  Similarly, the needs of the department store are not met by Plaintiffs' theory because the store obviously values increased tie sales in exchange for lower profit margins but is precluded from establishing a commission system that properly incentivizes its sales force from promoting the discounted ties.  Lastly, the customers' needs are not met by such a system because the sales representative will be less inclined to identify the lower-priced tie because of the lower commission (or, to bring it back to NutriSystem, the customer would not benefit from a strict price to commission ratio requirement because the Sales Associate would be disincentivized to notify him of discounts or promotions, which would lower the cost of the program).

The meaning of a bona fide commission need not be so restrictive.  As one court explained, "[b]y utilizing the term 'bona fide' commission rate, Congress apparently envisions a smell test, one that reaches beyond the formal structure of the commission rate and into its actual

effects and the purpose behind it.  Accordingly, as evidenced by the two examples of non-bona fide commission rates provided by Section 779.417(c), some payment plans that apparently are commission plans on their face may reveal themselves to be something different upon closer inspection."  Erichs v. Venator Group, Inc., 128 F.Supp.2d 1255, 1260 (N.D. Cal. 2001); see also Mechmet v. Four Seasons Hotels, Ltd., 825 F .2d 1173, 1175 (7th Cir.1987) (noting that the amount of commission is divided equally amongst employees of a certain rank, "without regard to the number of diners served by each employee.").

     **c.**     **To The Extent Some Proportionality Is Required, There Is A Clear Relationship Between The Price Paid By The Customer And The Commission Received Under NutriSystem's Commission Plan.**

Although the caselaw and DOL regulations establish that proportionality is not required for a commission plan to be bona fide under 7(i), in the event the Court holds that some correlation is required, NutriSystem's commission plan nonetheless has a proportionate relationship between the Plaintiffs' commissions and the Company's revenues.

Under NutriSystem's plan, the commissions awarded to Sales Associates reflect the price charged to consumers, and the amount ultimately paid to the Sales Associates can therefore be expressed as a percentage of the charge to consumers.  Where the percentage varies because the charges to consumers are not tied exclusively to the sales price (e.g., when the customer is eligible for certain discounts or promotions), the service provided by the Sales Associate nevertheless has *value*.  Thus, where NutriSystem sells its programs to customers at less than full price, it is still paying its employees a commission when it compensates them based upon the *value* of their work, even though that *value* does not correlate perfectly with the *price* of that particular product on that particular day.

21

It cannot be that an employer jeopardizes the commission nature of the payment system by being excessively generous.  For example, if a salesperson is generally paid a 10% commission on $100 sweaters the commission nature of those payments is not altered if, when an employer discounts those sweaters to $90, it chooses not to penalize the salesperson and still pays the commission based upon the regular retail price.  Nor should it affect the nature of the system if the sales person does not forfeit the initial commission when a sweater is returned.

Here, NutriSystem's commissions have a proportionate relationship with the value of the product being sold.  It is not as if Plaintiffs were paid the same $18 in commission for sales that generated $30 and $3000 in revenue.  Instead, Plaintiffs received these commissions for products that had a base price, but whose sales price would fluctuate depending upon the specific version of the product being sold (for example, 28-day silver versus 28-day vegetarian),[19] promotions being offered, and the customers' eligibility for discounts.  While there is not a strict percentage relationship between the commission and sales price, it is clear there is a strong correlation and limited price range within which the 28-day products are priced.

Plaintiffs cannot point to the $18, $25, and $40 commission prices for the same revenue ranges as evidence of lack of proportionality.[20]  These three prices are for three entirely distinct means of sales, and reflect the degrees of difficulty.  This is no different than a company rewarding a sales associate with a higher commission percentage for retaining a new client than it provides to a sales associate making an additional sale to a pre-existing client, even if both sales are for the same price, because the higher commission percentage reflects that the former is

---

[19]  NutriSystem and the public have a strong policy rationale for not creating different commission amounts for the different 28-day programs offered because it is important for health reasons that the Sales Associate recommends the appropriate weight management product for the customer without regard to the products' actual cost.

[20]  While NutriSystem's other commission plans such as "bad funds" are bona fide commissions under Section 7(i) for the same reasons as the 28-day program, the Court need only consider the 28-day program for purposes of determining whether Plaintiffs are exempt under 7(i).  This is because the commissions generated from the 28-day

the more difficult sale.  Put another way, NutriSystem's commissions are the same as a company offering higher commission rates in more competitive markets than in less competitive ones.

As such, NutriSystem's commission plan establishes a proportionate relationship between commission and revenue, in the event the Court holds that such a relationship is necessary to qualify as a bona fide commission plan.

> **d.     Plaintiffs' Theory That NutriSystem's Commission Plan Is A Piece-Rate System Is Wrong And Would Necessitate Significant Changes In The Compensation Plans Of The Retail Services Industry.**

In their Amended Complaint and briefs to the Court, Plaintiffs describe NutriSystem's commission plan as a "piece-rate" system.  The significance of this description is that "piece-rate" work does not fall within the scope of the Section 7(i) exemption.  A "piece-rate" system is often found in a manufacturing or agricultural setting.  By way of example, a garment worker may be paid a "piece rate" of $10 for each sweater produced; such a compensation system is not exempt from the statutory overtime requirements of the FLSA.  The question here, however, is not whether "piece-rate" systems in the *manufacturing* world are exempt, but whether incentive compensation arrangements in "*retail or service*" establishments fall within 7(i).[21]

The differences between a piece-rate and a commission illuminate why overtime for the former conforms with the policy rationale behind the FLSA, whereas the latter does not.  In a piece-rate system, the employee controls his compensation because it is directly tied to the speed in which the employee completes the piece.  Consider the aforementioned garment worker.  The

---

sales easily exceeded 50% of Plaintiffs' earnings. 29 C.F.R. § 779.412.  In any event, NutriSystem did not have these other plans in effect for the entirety of the Class Period.

[21] Indeed, the question of whether or not individuals are paid by "commission" arises as just one factor within 7(i), which is titled "Employment by retail or service establishment."  That is contrasted with Section 7(g), 29 U.S.C. § 207(g), which is titled "Employment at piece rates," and which does not apply specifically to retail sales establishments.  Under Section 7(g), which is inapplicable here, employees who are paid on a piece-rate basis are entitled to be paid at one-and-a-half times the bona fide piece rate for overtime worked in excess of 40 hours per week.

worker determines his compensation by the speed in which he produces the sweater. Crucially, it is the worker – and not a third-party like a customer – who controls the amount of compensation possible: the faster the sweater is knit, the more sweaters can be manufactured, and the more compensation the worker can receive. There is an exact correlation between hours and compensation: the more hours worked necessarily means the more sweaters produced which guarantees the higher compensation. Therefore, the employee is incentivized to work as many hours as possible because he knows the extra hours guarantee him greater compensation. Similarly, the employer is incentivized to encourage or require overtime hours (and that incentive would be even stronger if overtime pay was not required) because the extra hours guarantees the employer extra product which can be sold at a certain price.

In contrast to the sweater-producing piece-rate worker, employees subject to a commission plan like NutriSystem's do not have the same incentive to work overtime. This is because the NutriSystem Sales Associates cannot guarantee increased financial success by working longer hours, i.e., unlike the sweater manufacturer, there is no direct correlation between hours worked and sales made. While it is possible that increased hours will yield more successful sales calls, a Sales Associate can generate as much in commissions in 40 hours as he can make in 60 hours. In this regard, NutriSystem's Sales Associates cannot control their success, they are dependent on the willingness of the customer to go through with the sale. This is precisely the distinction made by Judge Posner in Yi between a commission and a piece-rate:

> Although the mechanics are paid by the job, this is not piecework…any more than selling real estate is piecework. You can spend 40 hours a week making quilts, and be paid by the quilt, and you won't be in the position of having to work overtime one week in order to make up slack time in the previous week. But if you're paid by the sale, you can't count on working steadily the same amount of time week after week, because sales depend on buyers' decisions, which are unpredictable…

Yi, 480 F.3d at 510. A piece-rate plan provides the employee with a reliability of compensation

not present in a commission plan, hence the overtime requirement.

Finally, if validated by this Court, Plaintiffs' theory would not just force NutriSystem to fundamentally revise its compensation plan, but would necessitate revisions across the retail services industries.  Essentially, according to Plaintiffs, retail establishments cannot claim the 7(i) exemption <u>unless</u> commissions are tied explicitly by percentage to price paid by the customer.  This theory would dismantle numerous compensation plans. As Judge Posner cautioned, "[t]he fact that a…interpretation [proposed by plaintiffs' counsel] might cause considerable turmoil in a major industry without benefiting anyone except lawyers…is not a sufficient reason for our decision, but it is not an irrelevant consideration either." <u>Mechmet</u>, 825 F.2d at 1177.   The implications of Plaintiffs' position extend far beyond NutriSystem's call center in Horsham.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, NutriSystem respectfully requests that the Court grant its Motion for Summary Judgment.

Respectfully submitted,

Dated: March 9, 2009

/s/ Jonathan S. Krause
Sarah E. Bouchard (PA I.D. #77088)
Jonathan S. Krause (PA I.D. # 93817)
Katherine E. Kenny (PA I.D. # 206993)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5077/5510/5256

Attorneys for Defendant
NutriSystem, Inc.